# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 27, 2024
Lyle W. Cayce
Clerk

No. 24-10017

Latrisha Winder, *Individually, as next friend of J.W., a minor and as personal representative of* the Estate of Stephen Wayne Winder, *Deceased*; Lily Winder; Stephen Tyler Winder; Kolene Winder, *as next friend of* E.W., *a minor*,

*Plaintiffs—Appellants*,

*versus*

Joshua M. Gallardo; Robert Travis Babcock; Young County, Texas,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:23-CV-59

Before Jones, Willett, and Engelhardt, *Circuit Judges*.

Per Curiam:

Upset that he saw Facebook messages between his wife and her ex-husband, Steve Winder became suicidal. Later that night, his wife Latrisha (who was out of state for National Guard training) called her mother and told her that Steve had sent her pictures in which he was holding a gun to his head.

Latrisha called the Young County Sheriff's department for a welfare check. Deputy Joshua Gallardo arrived and, after hearing Steve shout from within, opened the front door. Steve's mother-in-law indicated he was armed and walking to the nearby bedroom door. Deputy Gallardo yelled at Steve to put the gun down before fatally shooting him. Appellants sued for (1) warrantless entry, (2) excessive force, (3) supervisory liability, (4) *Monell* liability, and (5) ADA violations. The District Court dismissed the case at the 12(b)(6) stage. It did so correctly.

*First*, Steve's suicidality, combined with his possession of the means to follow through (the gun), created exigent circumstances excusing the need for a warrant. *Second*, an objectively reasonable officer in Deputy Gallardo's shoes wouldn't need for Steve to point the gun at him before using deadly force under the facts as pled and from what can be seen in Deputy Gallardo's body cam footage, defeating the excessive force claim. *Third*, there is no underlying constitutional violation to support a claim for supervisory or *Monell* liability. *Fourth*, Title II of the ADA (which Appellants sued under) doesn't support claims where police officers faced exigent circumstances, such as those created by which Steve's suicidality. We AFFIRM.

## I. Background

### A. Factual

Steve was enjoying an afternoon of swimming and drinks with family and friends when he accidentally got in his pool with his cell phone. So he went inside his house and charged his wife Latrisha's old cell phone. She was in Fort Lee, Virginia training for the National Guard at the time. On her phone, he found private Facebook messages between Latrisha and her ex-husband. Latrisha's ex-husband wanted to get back together, but she declined.

Presumably upset, Steve walked next door to show the messages to his mother-in-law, Lou Anne Phillips, around 4:00 p.m. Lou Anne sympathized with Steve, agreeing that Latrisha should have told him about the messages while emphasizing that Latrisha declined her ex-husband's advances. Steve went home, but later that evening Lou Anne began receiving texts from Latrisha expressing concern that she couldn't reach Steve and was worried about him because of his history of excessive drinking and mental illness, namely depression. Lou Anne went over to check on Steve, let him use her phone to call Latrisha, and took Steve's daughter J.W. back to her house at Steve's request.

Around 7:00 p.m. Latrisha called Lou Anne again, telling her that Steve sent pictures of himself holding a handgun under his chin and to his head, stating that he "could not bear it anymore." Lou Anne went to check on Steve again. Around the same time, Latrisha called the Young County Sheriff's Department to request a welfare check for Steve, informing officers that Steve had sent pictures holding a gun to his head.

Deputies Gallardo and Dwyer were dispatched to the Winders' home, driving in separate vehicles. Deputy Gallardo got there first, where Steve's niece escorted him to the Winders' front door. Lou Anne heard that someone was at the door and tried to retrieve the gun from Steve, but Steve got upset, yelling "I don't give a [expletive]. This is my home" and took the gun. Steve was heavily intoxicated at the time, with a BAC of .173.

After hearing Steve shout, Deputy Gallardo opened the door, said "Hello, Sheriff's Office," and remained on the porch.[1] He received no

[1] Appellants dispute this and claim that Deputy Gallardo entered the home, but body camera footage demonstrates that he remained outside the home until after the shooting occurred. But, as explained below, whether Deputy Gallardo entered the home or

immediate response, so he called out "Steve" in a louder voice. Steve responded "What?" from the bedroom, and Lou Anne emerged saying "We're right here. Can I help you?" But Lou Anne then saw Steve holding his gun and approaching the bedroom door. She told Steve to "put it up," and informed Deputy Gallardo that "he's got a gun." Deputy Gallardo drew his service weapon, radioed "he's got a gun, he's got a gun," and told Steve "put it down man, put it down." Deputy Gallardo then shot Steve once in the chest. Body cam footage indicates that the above took place over approximately 28 seconds.

Deputy Dwyer arrived about forty seconds after. The Deputies entered the bedroom and saw Steve on the floor and his handgun on the bed, which Deputy Gallardo secured and removed to one of their vehicles. The Deputies rendered aid until emergency medical services arrived a few minutes later, but Steve ultimately died.

### B. Procedural

Appellants asserted claims for warrantless entry, excessive force, supervisory liability, *Monell* liability, and Americans with Disabilities Act ("ADA") violations against Deputy Gallardo, Sheriff Robert Travis Babcock, and Young County, Texas. Defendants filed a Motion to Dismiss, which the District Court granted. Appellants timely appealed.

## II. Standard of Review

A district court's Fed. R. Civ. Pro. 12(b)(6) dismissal on the pleadings receives *de novo* review. *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). In conducting that review, we accept "all well-pleaded

---

not is non-dispositive because Steve's suicidality and possession of the means to follow through (the gun) created exigent circumstances justifying warrantless entry. *Infra* III(B).

facts as true and draw[s] all reasonable inferences in favor of the nonmoving party." *Id.* We do not, however, "presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Id.* (cleaned up) (quoting *Ashcroft v. Iqbal.*, 556 U.S. 662, 678 (2009)). But while "the court accepts 'all well-pleaded facts as true and draw[s] all reasonable inferences in favor of the nonmoving party,'" "the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (cleaned up).

The parties disputed in a motion to strike whether the body cam video was sufficiently referenced to the point of being incorporated in the complaint; regardless, the District Court noted that it relied solely on the complaint in dismissing the case and denied that motion as moot. Appellants nevertheless referenced the video in their complaint and brief, included several screenshots from the video in their complaint, and caselaw supports our consideration of the video. *See, e.g.*, *Harmon*, 16 F.4th at 1162–63 (relying on appended video evidence to affirm district court's dismissal of all claims based on qualified immunity); *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024); *see also, e.g.*, *Salinas v. Loud,* No. 22-11248, 2024 WL 140443, at *1 (5th Cir. Jan. 12, 2024) (unpublished).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity, we must decide (1) whether a plaintiff has alleged facts sufficient to establish a

constitutional violation, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). And we have discretion to determine the order in which we consider those questions. *Id.* at 236.

## III. Discussion

### A. We decline Appellants' invitation to upend qualified immunity.

Before delving into their case's substance, Appellants first request that we upend qualified immunity outright. This request is, as Appellants concede, outside our abilities. ("While this Court cannot abrogate Supreme-Court authority on QI, Plaintiffs raise it now for potential argument in the Supreme Court."). "As a panel of this court, however, we are bound by the precedential decisions of both our court and the Supreme Court." *Garcia v. Blevins*, 957 F.3d 596, 602 (citing *Vaughan v. Anderson Reg. Med. Ctr.*, 849 F.3d 588, 591 (5th Cir. 2017)) (rejecting argument to reconsider Fifth Circuit's approach to qualified immunity). We decline Appellants' invitation.

### B. Appellants' warrantless entry claim.

Appellants argue that Deputy Gallardo's warrantless entry was an unjustified violation of Steve's constitutional rights. Appellees assert qualified immunity, responding that Deputy Gallardo never entered the home until after the shooting, and even if he did, Steve's suicidality created an exigent circumstance justifying warrantless entry. Even taking Appellants' version of the facts as true in the face of body camera footage demonstrating otherwise, Appellants do not allege facts overcoming an exigent circumstance under this Circuit's decision in *Rice v. Reliastar Life Ins.*, which held that suicidality "may create an exigency . . . so compelling

that a warrantless entry is objectively reasonable under the Fourth Amendment." 770 F.3d 1122, 1131 (5th Cir. 2014).

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398 (2006) (cleaned up). But the exigent circumstances exception exists, applying when '"the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (citation omitted). "The Government bears the burden of demonstrating exigent circumstances." *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008).

Suicidality presents a tragically common example of exigent circumstances. *See, e.g., Rice*, 770 F.3d at 1131 (granting qualified immunity) ("This is not the first time we have encountered a tragic factual scenario like the one present here: a police officer, in an attempt to aid a potentially suicidal individual, entered without a warrant and killed the person the officer was trying to help.") (collecting cases). *Rice* squarely confronted the issue of "whether the exigent circumstances exception to the warrant requirement may allow for a warrantless entry based on the threat an individual poses to himself." *Id.* And *Rice* "h[e]ld that the threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment." *Id.* "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* (quoting *Brigham City*, 547 U.S. at 403). "This need to protect or preserve life is *not* limited to instances where violence is directed to another person; the need to protect and preserve life can be just as strong when the violence is directed at one's self." *Id.* (emphasis added) (citing *Fitzgerald v. Santoro*, 707 F.3d 725, 731 (7th Cir. 2013)); *see also, e.g.,*

*Clark*, 850 F. App'x at 211 ("The exigency of a credible risk that a person is about to end their life justifies[] warrantless entr[y.]").

Body camera footage shows that Deputy Gallardo did not enter until after the shooting. But, even if he did, the 911 call made clear that Steve was suicidal and potentially in possession of a gun, just like the decedent in *Rice*. *Rice*, 770 F.3d at 1132. Thus, Deputy Gallardo's warrantless entry was objectively reasonable because it was prompted by credible information that Steve both "was a suicide risk *and* had the means to act on it." *Clark v. Thompson*, 850 F. App'x 203, 211 (5th Cir. 2021) (emphasis added); *Rice*, 770 F.3d at 1132. Deputy Gallardo's entry was clearly in line with *Rice*, exigent circumstances existed, and no constitutional violation occurred.

**C. Appellants' excessive force claim.**

Appellants assert that Deputy Gallardo used excessive force when he shot Steve, and Appellees counter that Deputy Gallardo's use of force is protected under qualified immunity. Excessive force claims must establish "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (cleaned up). An injury occurred—Deputy Gallardo shot and killed Steve—so the analysis hinges on prongs (2) and (3). Deputy Gallardo's use of force, viewed "from the perspective of a reasonable officer on the scene," *Graham v. Connor*, 490 U.S. 386, 388 (1989), was neither excessive nor unreasonable because "[a] police officer does not have to permit a suspect to aim his weapon before answering the threat." *Jones v. Shivers*, 697 F. App'x 334, 334 (citing *Salazar-Limon v. City of Houston*, 826 F.3d at 272, 279 n.6 (5th Cir. 2016).

"Reasonableness" is an objective inquiry: one asks "whether the officers' actions are 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. And one must account for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. To access reasonableness, we consider three factors that the Supreme Court outlined in *Graham v. Connor*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville*, 567 F.3d at 167 (citing *Graham v. Connor*, 490 U.S. at 396).

When it comes to deadly force, "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). And "if the officer believes the suspect has a gun, the calculation changes—*even if there was never, in fact, a gun*." *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023) (emphasis added). Uses of force may be reasonable when the officer could reasonably believe the suspect was reaching for or had a gun. *See, e.g.*, *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 385 (5th Cir. 2009) (officer did not use excessive force even when subsequent search of bedroom revealed *no* weapons)("[T]his court has upheld the use of deadly force where a suspect moved out of the officer's line of sight and could have reasonably been interpreted as reaching for a weapon."); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991) (police did not use excessive force when a decedent repeatedly refused to keep hands raised and appeared to be reaching for an object,

despite the "fact that [the decedent] *was actually unarmed.*") (emphasis added).

Much confusion exists around whether Steve was, in fact, holding a gun the moment he was shot. The body cam footage is inconclusive: Deputy Gallardo was standing outside the front door peering into the home after being informed by Lou Anne that Steve "ha[d] a gun," so the doorframe obscures where Steve was standing and footage neither confirms nor denies that Steve was holding a gun. At the same time, the complaint alleges that Steve "had gotten up from his chair *with his gun*" and walked "to the bedroom doorway" while yelling. Lou Anne herself even believed Steve had a gun, telling him to "put it up" and informing Deputy Gallardo "he's got a gun." And Deputy Gallardo radioed this information, then told Steve "put it down man, put it down" directly before firing, indicating that he saw (or at least believed that he saw) Steve holding a gun before firing. But whether Steve was *in fact* aiming a gun at Deputy Gallardo does not matter—binding caselaw demonstrates that what matters is whether Deputy Gallardo could *reasonably believe* that Steve was reaching for or had a gun. *See, e.g.*, *City of Rosenberg*, 564 F.3d at 385.

Taking the facts alleged as true, a reasonable officer in Deputy Gallardo's position would have reasonably believed that Steve had or was reaching for a gun—meaning Steve "pose[d] a threat of serious harm to [him] or to others." *Manis*, 585 F.3d at 843. The body cam footage and complaint as pled show as much, including (1) the 911 call informing Deputy Gallardo that Steve had a gun and was in an unstable (indeed suicidal) mental state, (2) Steve's walking toward the door while yelling, (3) Lou Anne telling Steve to "put [the gun] up," (4) Lou Anne informing Deputy Gallardo that "he's got a gun," and (5) Deputy Gallardo commanding Steve twice to "put [the gun] down." Nor would a reasonable officer in Deputy Gallardo's position "have to permit [Steve] to aim his weapon before answering the

threat." *Jones*, 697 F. App'x at 334; *see also Salazar-Limon,* 826 F.3d at 279 n.6 ("[W]e have never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety.") (collecting cases). Deputy Gallardo's use of deadly force was neither excessive nor unreasonable under our binding caselaw, meaning no constitutional violation occurred.

**D. Appellants' supervisory liability claim.**

Appellants also allege a failure-to-supervise claim against Sheriff Babcock, relying on the single incident exception to do so. Appellants needed to show "(1) the [sheriff] failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights." *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). Even assuming *arguendo* that there was a failure to supervise, Appellants cannot succeed at the second step because no violation of rights occurred. *Supra* III(B)–(C).

**E. Appellants' *Monell* claim.**

Appellants also levy a *Monell* claim against Young County. "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "'[I]t is well established that there must be an underlying constitutional violation for there to be a claim under *Monell*.'" *Landry v. Laborde-Lahoz*, 852 Fed. App'x 123, 127 (5th Cir. 2021) (quoting *Taite v. City of Fort Worth Texas*, 681 F. App'x 307, 309 (5th Cir. 2017)). But no constitutional violation took place here. *Supra* III(B)–(C). So, the *Monell* claim lacks an underlying constitutional claim and therefore fails.

**F. Appellants' ADA claims.**

Finally, Appellants argue that Young County violated the ADA. An ADA plaintiff must show: "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). Key here is *Hainze v. Richards*, which foreclosed ADA claims where police officers face exigent circumstances. *See* 207 F.3d 795, 801 (5th Cir. 2000) (qualified immunity case where an officer shot a suicidal, mentally ill man threatening and advancing toward him with a knife) (Title II of the ADA "does not apply to an officer's on-the-street responses to reported disturbances, whether or not those calls involve subjects with mental disabilities"); *see also Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 235 (5th Cir. 2017) (ADA allows "individuals to sue local governments for disability discrimination committed by police in *non-exigent circumstances*." (emphasis added)).

As discussed above, there were indeed exigent circumstances—Steve "was a suicide risk *and* had the means to act on it." *Clark*, 850 F. App'x at 211 (emphasis added); *see supra* III(B). These exigent circumstances (circumstances resembling those in *Hainze* itself) foreclose ADA relief. *See* 207 F.3d at 801. Moreover, Appellants cannot show that Steve was discriminated against "by reason of his disability" (here, depression). Appellants point to no facts showing that Deputy Gallardo shot Steve *because* Steve was depressed. Instead, they assert that Young County lacked policies to "protect [Steve's] welfare" or "respond[] to threatened suicide calls with well-established crisis intervention techniques, including responding with a mental-health professional." But this doesn't demonstrate that Deputy Gallardo shot Steve "by reason of" his depression. Deputy Gallardo shot Steve "by reason of" circumstances that would lead an objectively

reasonable officer to reasonably believe that Steve was reaching for or had a gun. *Supra* III(C).

## IV. Conclusion

We AFFIRM the District Court in full for the reasons stated.